# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **KATHY HICKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:08-CV-0615-SLB** |
| | ) | |
| **UNITED STATES STEEL CORP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 25.)[1] Plaintiff Kathy Hicks has sued her employer, defendant United States Steel, alleging that her work environment was hostile due to her gender and race.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 25), is due to be granted.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255.  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988))(emphasis added).

2

## II. <u>STATEMENT OF FACTS</u>[2]

Defendant United States Steel Corporation ("U.S. Steel") produces steel at a facility located in Fairfield, Alabama ("Fairfield Works").  (Doc. 27 at 1 [citing doc. 26, Ex. A at 15].)  Plaintiff Kathy Hicks is a black female who has been employed by U.S. Steel at Fairfield Works since 1990.  (Doc. 27 at 1 [citing doc. 26, Ex. A at 14-15].)   The management chain of command, from lowest to highest was as follows:  (1) Shift Manager or Foreman, (2) Coordinator, (3) Area Manager, (4) Division Manager, and Plant Manager.  (Doc. 31 at 7; *see* doc. 32, Ex. 6 at 37-38.)  Kevin Henson was the Area Manager in 2004 and 2005.  (Doc. 31 at 7 [citing doc. 32, Ex. 6 at 16]; *see also* doc. 32, Ex. 6 at 15.)  Plaintiff and her co-workers worked under Kevin Henson's chain of command.  (Doc. 31 at 9-10 [citing doc. 32, Ex. 6 at 60, 87].)  John Scarvey was a Shift Manager from 2003 until 2005 or 2006 when he was promoted to Production Coordinator in the Sheet Mill.  (Doc. 32, Ex. 4 at 22-23.)  Scarvey, a white male, was Hicks's regular supervisor.  (Doc. 27 at 2 [citing doc. 26, Ex. A at 37-38, 46].)  Ed Sype, a white male, was also a Shift Manager from 2002 until he retired in February 2009.  (Doc. 31 at 7 [citing doc. 32, Ex. 5 at 7,10; *id*., Ex. 6 at 39].)  Occasionally, he supervised Hicks's crew.  (Doc. 27 at 2 [citing doc. 26, Ex. A at 35-36].)

---

[2]As required when determining a Motion for Summary Judgment, the court has construed the facts in the light most favorable to plaintiff, the non-moving party.  All disputed facts are resolved in her favor, and all reasonable inferences arising from those facts are drawn in her favor. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir,. 1997).

3

In 2004, Hicks was working as a Utility Person in the Sheet Mill – Warehouse/Shipping Department – where she wrapped steel coils with paper and plastic prior to them being shipped to customers. (Doc. 27 at 2 [citing doc. 26, Ex. A at 23-24, 26, 40, 59].) Coils of steel come out of one of the mills. (Doc. 31 at 7; doc. 26, Ex. A at 53-54.) Paper is placed on the floor and the coils, weighing 35,000 to 48,000 pounds and standing 2.5 to 4 feet wide and 6 feet tall, were placed on the paper and "wrapped" by the wrapping crew. (Doc. 31 at 7-8 [citing doc. 32, Ex. 4 at 41; *id*., Ex. 5 at 24; *id*., Ex. 6 at 45-47].) Typically one wrapping crew worked the day shift, 7:00 a.m. until 3:00 p.m. and another crew worked the afternoon shift, 3:00 p.m. until 11:00 p.m. (Doc. 31 at 8 [citing doc. 32, Ex. 4 at 40; *id*., Ex. 6 at 38, 47-48].) The crews alternated shifts on a weekly basis. (Doc. 27 at 3 [citing doc. 26, Ex. A at 42-43].)

Although the individuals on the crew sometimes changed, the crew generally had two employees wrapping coils with paper (the "Wrappers"); one employee cutting paper (the "Paper-Cutter"). (Doc. 27 at 3 [citing doc. 26, Ex. A at 37-39].) Hicks and Irene Scott, a black female, were generally assigned as Wrappers on the same crew. (Doc. 27 at 3 [citing doc. 26, Ex. A at 38].)

One of the types of coils was the Brockway coil. The Brockway coils were special steel coils that defendant produced for a certain customer; those coils consisted of a very thin steel sheet that rusted easily; thus, there was a need to wrap the Brockway coils quickly. (Doc. 31 at 8 [citing doc. 32, Ex. 2 at 55-56; *id.*, Ex. 4 at 45-46].) Also, because of the

susceptibility to rust, the Brockway coils are double wrapped with both paper and plastic; therefore, the Brockway coils took twice as long to wrap as single-wrapped coils. (Doc. 31 at 9 [citing doc. 26, Ex. A at 80-82; doc. 32, Ex. 2 at 55; *id.*, Ex. 3 at 14; *id*, Ex. 5 at 28-29, 62; Ex. 6 at 52-53].)  Crews complained about wrapping the Brockway coils and they complained that other crews avoided wrapping the Brockway coils. (Doc. 31 at 9 [doc. 32, Ex. 3 at 14, 20; *id*., Ex. 12 at 21].)

Scarvey testified that he did not give wrapping crews daily instructions; rather, he let the crews decide the order of wrapping the coils. (Doc. 31 at 9 [citing doc. 32, Ex. 4 at 42-43].)  When plaintiff complained about the other crew leaving Brockway coils for her to wrap, Scarvey told her she could pick her coils.  Plaintiff testified, "There were times when the other crew was allowed to skip coils and we would have to go and wrap them.  [Scarvey] told me I could cherry pick, too.  . . .  I could pick out the type of coils I wanted to wrap."  (Doc. 26, Ex. A at 103.)

The Area Manager and Coordinator would prepare the schedule on Thursday before the work week started on the following Sunday, and Shift Managers had the authority to change the schedule. (Doc. 31 at 9 [citing doc. 32, Ex. 2 at 58; *id.,* Ex. 5 at 34, 35; *id*., Ex. 6 at 73-74.)  Shift Managers assign individual employees to a wrapping crew and assign the crew's work duties for each shift. (Doc. 31 at 9 [citing doc. 32, Ex. 4 at 59; *id*., Ex. 6 at 51.)  The Shift Managers can change the duty assignments without the approval of upper

management.  (Doc. 31 at 9 [citing doc. 32, Ex. 5 at 19; *id.,* Ex. 6 at 80].)  Shift Managers can approve overtime.  (Doc. 31 at 9 [citing doc, 32, Ex. 6 at l8].)

When plaintiff's crew relieved Sype's usual wrapping crew, Sype sometimes told them what was left to finish or needed to be done.  (Doc. 26, Ex. A at 52-56.)  Plaintiff testified: "A lot of times they [Sype's crew] would skip those [harder to wrap coils] and do the easiest coils.  And then when my shift [would] the come on they would direct me to go to a certain area that wasn't finished." (*Id*. at 161.)

On February 10, 2004, Sype complained that plaintiff's crew had not wrapped enough coils based on the wrapping report and on the number of coils left to be wrapped for Sype's crew.  (Doc. 31 at 10 [citing doc. 32, Ex. 5 at 46-47].)  A meeting on February 11, 2004, is plaintiff's first alleged act of harassment.  Hicks had to meet with Scarvey, Sype, and Area Manager Kevin Henson to explain why her crew had only wrapped 37 coils on February 10, 2004. (Doc. 27 at 4 [citing doc. 26, Ex. A at 98-99; *id*., Ex. C3].)  Henson called the meeting because Sype had complained to him about the number of coils that Hicks wrapped on February 10, 2004.  (Doc. 27 at 4 [citing Ex. A at -98].)  Before Sype had complained, another employee, Sandra Dill, had told him that coils were produced throughout Hicks's shift on February 10, 2004, which suggested that Hicks should have wrapped more coils. (Doc. 27 at 4-5 [citing doc. 26, Ex. A at 95, 110-12].)  At the meeting, Henson asked Hicks why she had only wrapped 37 coils.  (Doc. 27 at 5 [citing doc. 26, Ex. A at 101].)  Hicks explained that there were no coils to wrap early in the "start-up" phase of the shift. (Doc. 27

6

at 5 [citing doc. 26, Ex. A at 95-98].)   Hicks admits that Henson spoke to her in a professional manner, that Sype did not argue with her, and that everyone understood her explanation at the conclusion of the meeting.  (Doc. 27 at 5 [citing doc. 26, Ex. A at 102, 108-09].)

The next act of alleged harassment occurred on February 23, 2004, when Scarvey required plaintiff and Scott to cut paper and wrap 35 coils.  (Doc. 27 at 5 [citing doc. 26, Ex. A at 113-14, 117; *id*., Ex. C-3].)  On that same day, Sype allegedly instructed two men (one black, one white) on his crew to only cut paper and not worry about wrapping coils.  (Doc. 27 at 5 [citing doc. 26, Ex. A at 113].)  A Paper Cutter had not been assigned that day due to a scheduling error.  (Doc. 27 at 5 [citing doc. 26, Ex. A at 117-18].)  Hicks does not know why Sype told the male employees on his crew to only cut paper.  (Doc. 27 at 6 [citing doc. 26, Ex. A at 120].)  She does not recall whether she immediately complained about the event to a supervisor, although she may have mentioned it to Scarvey.  (Doc. 27 at 6 [citing doc. 26, Ex. A at 120].)

The next act of alleged harassment occurred on March 2, 2004, when her crew wrapped 57 coils, 51 of which were Brockway, that were left unfinished by the previous shift.  (Doc. 27 at 7 [citing doc. 26, Ex. A at 120-21; *id*., Ex. C-3].)   When she arrived at work that day, plaintiff noted a number of unwrapped Brockway coils and assumed the previous crew had not wrapped any Brockway coils and left them for her crew to wrap. (Doc. 31 at 11; doc. 26, Ex. A at 120, 125-26.)  She asked Henson why there were so many

Brockway coils, and Henson told her to ask Sype.  (Doc. 31 at 11 (citing doc. 26, Ex. A at 120-21].)  Hicks questioned Sype about the number of coils left unfinished from the previous shift.  (Doc. 27 at 6 [citing doc. 26, Ex. A at 120-21].)  Sype told plaintiff that she was not "the only one wrapping Brockway, but if [she] thought she was then write it down."  (Doc. 27 at 6 [citing doc. 26, Ex. A at 121].)  Hicks did not immediately complain to anyone about this statement.  (Doc. 27 at 6 [citing doc. 26, Ex. A at 129].)

Next, Hicks references alleged harassment that occurred on July 11, 2004, while working four hours of overtime wrapping coils with Charlie Lorino.  (Doc. 27 at 6 [citing doc. 26, Ex. A at 131; *id*., Ex. C-3 and C-4].)  Plaintiff complained to Henson that other crews were getting assistance and she felt her crew should get extra help.  (Doc. 31 at 11 [citing doc. 26, Ex. A at 137-38].)  On that day, Sype allowed Sandra Dill, a white female, to work overtime preparing coils for the Wrappers on the day shift.  (Doc. 27 at 7 [citing doc. 26, Ex. A at 131-38].)  Plaintiff testified that she believed Dill should have been  wrapping because the building was full of coils.  (Doc. 26, Ex. A at 134-35.)  Hicks does not know why Sype divided the responsibilities this way.  (Doc. 27 at 7 [citing doc. 26, Ex. A at 138].)  She testified that she had tried to tell Henson about an incident involving a particular employee, Tara Dill, that she believed should have helped her crew, but Henson did not understand.  (Doc. 31 at 11; doc. 26, Ex. A at 138, 148.)

8

On a Sunday,[3] Henson had made out the work schedule and assigned three individuals to wrapping – Plaintiff, Scott, and Brad Ross.  (Doc. 31 at 11 [citing doc. 26, Ex. A at 149, 150; doc. 32., Ex. 6 at 41-44].)  Thereafter, Sype reassigned Brad Ross away from the wrapping crew and to a banding job.  (Doc. 31 at 11-12.)  The loss of Brad Ross on the wrapping crew made plaintiff's job "a little bit more cumbersome."  (Doc. 31 at 12 [citing doc. 26, Ex. A at 158].)  Scott confronted Henson who had no idea that Ross had been reassigned.   (Doc. 31 at 11.)  Henson and Sype were the only two management officials working on that particular shift.  (Doc. 31 at 11-12 [citing doc. 26, Ex. A at 152-53].)  Sype does not recall pulling Brad Ross off plaintiff's wrapping crew and he admitted that pulling a third-member off the wrapping crew would have slowed the crew down.  (Doc. 31 at 12 [citing doc. 32, Ex. Ex. 5 at 45-46].)  Sype testified that he had occasionally assigned a third individual to assist the wrapping crew during his shifts.  (Doc. 31 at 12 [citing doc. 32, Ex. 5 at 43].)

Sype told Charles Lorino and Antonio Alexander to leave the bigger coils for those "old hags and old bitches to wrap," referring to plaintiff and Scott.  (Doc. 31 at 15 [citing doc. 32, Ex. 11 ¶ 5].)  This incident occurred in late 2004 or early 2005.  Plaintiff has presented evidence that Sype referred to plaintiff as a bitch or a hag on an almost daily basis, (doc. 32, Ex. 7); however, he did not refer to plaintiff in those derogatory terms in her presence and she was unaware of such references until after she complained to defendant.

---

[3]Plaintiff did not remember the exact date.  (Doc. 26, Ex. A at 149-50.)

(Doc. 26, Ex. A at 176 [plaintiff's first complaint was May 8, 2005; plaintiff learned that Sype had referred to her and Scott as bitches and hags on May 15, 2005]; *id.*, Ex. C-4 ["After I filed my initial claim of discrimination, on several occasions Mr. Sype was heard to call myself and Ms. Scott '[o]ld bitches, old hags, can wrap those coils of steel.'   These comments were heard by Antonio Alexander and Charlie [Lorino]."].)

The next act of alleged harassment occurred in March 2005, when Hicks's tools were missing. (Doc. 27 at 7 [citing doc. 26, Ex. C-4; *id.*, Ex. A at 173].) U.S. Steel issued the tools to Hicks, and she was able to use another set of tools to perform her job that day.  (Doc. 27 at 7 [citing doc. 26, Ex. A at 173-76].)  Hicks's co-workers told her that Sype was bragging about taking the tools. (Doc. 27 at 7-8 [citing doc. 26, Ex. A at 173-76].)  She does not know why her tools were taken.  (Doc. 27 at 8 [citing doc. 26, Ex. A at 176].)

Finally, Hicks references alleged harassment with the way that overtime was assigned. (Doc. 27 at 8 [citing doc. 26, Ex. A at 233-34; *id.*, Exs. C-4 and C-5].)  In assigning overtime, employees with the most seniority are given the first opportunity.  (Doc. 31 at 12 [citing doc. 32, Ex. 4 at 62; *id.*, Ex. 5 at 53; *id.*, Ex. 6 at 92].)  Plaintiff and Scott had more seniority than anyone in the warehouse.  (Doc. 31 at 13.)  In April 2004, Sype approved three overtime shifts for Shannon, who was a probationary employee at the time. (Doc. 31 at 14 [citing doc. 32, Ex. 5 at 53].)  Plaintiff does not argue that she was available for these overtime shifts. (*See* doc. 31 at 14.)  According to Hicks, Tom Ross and Jeff Shannon were allowed to work a great deal of overtime in the Fall of 2005.  (Doc. 27 at 8 [citing doc. 26, Ex. A at 234-35;

*id.*, Ex. C-4].)  Hicks also testified that she was asked to work one hour of overtime on June 18, 2006, while Shannon was given approximately seven hours of overtime.  (Doc. 27 at 8 [citing doc. 26, Ex. A at 253-54; *id.*, Ex. C-5].)  She also contends that several white males were scheduled to work seven straight days when the schedule was issued on April 12, 2007, while she was only scheduled Monday through Friday.  (Doc. 27 at 8.)  Working on Sunday offers time-and-half for eight hours.   (Doc. 27 at 8 [citing doc. 26, Ex. A at 258-60; *id.*, Ex. C-5].)

Hicks's final reference to overtime issues dealt with Sype approving Tom Underwood, a white male, for overtime work on Sunday, May 6, 2007.  (Doc. 27 at 8 [citing doc. 26, Ex. A at 264-65; *id.*, Ex. C-5].)  When plaintiff confronted Scarvey, he admitted he had made making a mistake in scheduling Underwood, and he may have told plaintiff that Sype had actually scheduled Underwood.  (Doc. 31 at 13 [citing  doc. 32, Ex. 4 at 73-74; *id.*, Ex. 6 at 101].)

Hicks admits she received overtime in 2004 through 2007, and occasionally earned overtime in smaller increments at her preference.  (Doc. 27 at 8 [citing doc. 26, Ex. A at 234, 247].)  She refused overtime opportunities on occasion.  (Doc. 27 at 9 [citing doc. 26, Ex. A at 239].)  Hicks admits that she worked on Sundays when employees receive additional pay. (Doc. 27 at 9 [citing doc. 26, Ex. A at 260].)  She did not report any issues concerning overtime under the anti-harassment policies.  (Doc. 27 at 9 [citing doc. 26, Ex. A at 257, 265-66].)

11

U.S. Steel's employment policies prohibit, among other things, harassment and discrimination based on sex and race.  (Doc. 27 at 1 [citing doc. 26, Ex. A at 145; *id*, Exs. D and E].)  The policies also advise employees of procedures that they must follow to report such behavior.  (Doc. 27 at 1-2 [citing doc. 26, Ex. A at 146; *id*, Exs. D and E].)  The collective bargaining agreement between U.S. Steel and the union representing Hicks also established a Civil Rights Committee, which investigates and attempts to resolve civil rights complaints filed by bargaining unit employees.  The Committee consists of both Management and Union representatives.  (Doc. 27 at 2 [citing doc. 26, Exs. F and G].)  Hicks knew that she could report harassment to U.S. Steel under its policies and the collective bargaining agreement.  (Doc. 27 at 2 [citing doc. 26, Ex. A at 145-46].)

On May 8, 2005, Hicks submitted a Civil Rights Complaint to U.S. Steel that referenced the events from February 11th and 23rd, 2004, March 2, 2004, July 11, 2004, March of 2005, and April of 2005.  (Doc. 27 at 9 [citing doc. 26, Ex. A at 166-73; *id*., Ex. F].)  This was Hicks's first report of objectionable behavior to U.S. Steel.  (Doc. 27 at 9 [citing doc. 26, Ex. A at 146-47, 266].)  U.S. Steel immediately initiated an investigation. (Doc. 27 at 9 [citing doc. 26, Ex. G].)  Jodi Watson, defendant's representative on the Civil Rights Committee, met with Ed Sype to address the accusations.  (Doc. 27 at 9 [citing doc. 26, Ex. G-1].)  Sype told her that he did not recall any of the specific incidents reported by Hicks, with the exception of the event in April of 2005.  (Doc. 27 at 9 [citing doc. 26, Ex. G-

12

1].)  Sype denied making any derogatory statement about Hicks.  (Doc. 27 at 9 [citing doc. 26, Ex. G-1].)

Watson subsequently discussed Sype's response to the allegations with Hicks's union representative, Sylvia White, on May 23, 2005.  (Doc. 27 at 10 [citing doc. 26, Ex. G-2].)  During their meeting, White told Watson that two male employees had told Hicks that Sype had referred to her and Scott as "bitches and hags."  (Doc. 27 at 10 [citing doc. 26, Ex. G-2].)  White did not know the names of these men.  (Doc. 27 at 10 [citing doc. 26, Ex. G-2].)  Watson then said she would talk to Sype and follow-up with White.  (Doc. 27 at 10 [citing doc. 26, Ex. G-2].)

On June 2, 2005, White notified Watson that Charles Lorino and Antonio Alexander were the individuals who had told Hicks about Sype's comment.  (Doc. 27 at 10 [citing doc. 26, Ex. G-3].)  Watson then called Sype; during the call, Sype again denied making any derogatory statement.  (Doc. 27 at 10 [citing doc. 26, Ex. G-4].)

On June 27, 2005, Watson, White, and Hicks met to discuss Hicks's complaint; during this time, Hicks mentioned that she had learned of the specifics of Sype's comment from Lorino and Alexander.  (Doc. 27 at 10 [citing doc. 26, Ex. A at 176-78; *id.*, Ex. G-6].)  Sype never made the comment directly to Hicks, and she did not know how recently he had used the derogatory terms.  (Doc. 27 at 10 [citing doc. 26, Ex. A at 189, 194-95; *id.*, Ex. G-6].)

On July 18, 2005, Watson spoke with Alexander, who acknowledged hearing Sype make the comment in reference to Hicks and Scott in late 2004 or early 2005. (Doc. 27 at 10 [citing doc. 26, Ex. G-7].)

The Civil Rights Committee discussed Hicks's complaint again on August 22, 2005. (Doc. 27 at 11 [citing doc. 26, Ex. G-10].) Watson confirmed with Union representative James Bates that Sype received a copy of the anti-harassment policy. (Doc. 27 at 11 [citing doc. 26, Ex. G-10].) Bates then mentioned that Sype recently directed the Paper Cutter on Hicks's crew to work in the mill. (Doc. 27 at 11 [citing doc. 26, Ex. G-10].) Bates acknowledged that Sype had a legitimate reason to reassign someone to the mill, but suggested that moving a Laborer was a better option. (Doc. 27 at 11 [citing doc. 26, Ex. G-10].) Watson indicated that she would speak with Sype and Henson about the incident. (Doc. 27 at 11 [citing doc. 26, Ex. G-10].)

Watson met with Hicks again on October 11, 2005, to detail what she had done concerning her complaint to that point. (Doc. 27 at 11 [citing doc. 26, Ex. A at 206-08; *id*., Ex. G-11].) During their discussion, Hicks expressed dissatisfaction that Sype was not being fired. (Doc. 27 at 12.) Watson stated that Hicks did not report Sype making any inappropriate comments since the one that was reportedly made in late 2004 or early 2005. (Doc. 27 at 12.) Hicks then said that she would pursue this matter outside the company. (Doc. 27 at 12 [citing doc. 26, Ex. G-13].)

14

The Committee closed the case on October 13, 2005, after Watson spoke with Hicks. (Doc. 27 at 12 [citing doc. 26, Ex. A at 221-22; *id.*, Ex. G-13].)

Hicks filed an EEOC charge on October 27, 2005, claiming race and sex discrimination under Title VII, and violation of the Equal Pay Act ("EPA").  (Doc. 27 at 12 [citing doc. 26, Ex. H].)  After receiving her right to sue letter from the EEOC, Hicks filed the instant action.  (Doc. 27 at 12 [citing doc. 26, Ex. B]; *see also* doc. 1.)

### III.  DISCUSSION

Plaintiff alleges that her work environment was hostile due to sexual and racial harassment in violation of Title VII, 42 U.S.C. § 2000e-2, and Section 1981, 42 U.S.C. § 1981.  (Doc. 1 ¶¶ 8, 12, 15.)  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is ***sufficiently severe or pervasive*** to ***alter the conditions of the victim's employment*** and create an abusive working environment, Title VII and [Section 1981 are] violated."[4]  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998)(emphasis added).  To establish a claim for hostile or abusive working environment based on racial or sexual harassment, an employee must show:

> (1) that [she] belongs to a protected group; (2) that [she] has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [race or gender]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and

---

[4]Title VII and Section 1981 claims based on hostile work environments have the same proof requirements and use the same analytical framework.  *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282-83 (11th Cir. 2002)(citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)(citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)); *see also Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1279-80 (11th Cir. 2003).

Defendant contends, *inter alia*, that plaintiff cannot show that her work environment was hostile due to racial and/or sexual harassment because the discrete acts of discrimination of which she complains cannot be considered as forming part of her hostile work environment.  It argues that this court may not consider the allegations regarding overtime and job assignments to support plaintiff's hostile environment claim because these incidents are discrete acts of discrimination and not "discriminatory intimidation, ridicule, and insult." (Doc. 27 at 18-21.)  It argues:

> Specifically, Hicks alleges that her hostile work environment consisted of:  (i) being required to cut paper and wrap 35 coils on February 23, 2004, while Sype instructed two males to cut paper only and not wrap; (ii) working overtime on July 11, 2004, without assistance from Dill; (iii) having a Wrapper removed from her crew; (iv) Ross and Shannon receiving more overtime than her; (v) white males working 7 straight days; and (vi) Underwood receiving overtime on May 6, 2007.  As recognized in *McCann* [*v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008)] . . ., Hicks might have been able to rely upon these discreet incidents had she brought a separate disparate treatment claim. They cannot be relied upon, however, to support a hostile work environment claim.   Hostile  work  environment  claims  center  on  "discriminatory intimidation,  ridicule,  and  insult",  which  is  clearly  lacking  in  Hicks'[s] allegations  concerning  patterns  of  discrimination  practiced  against  black female  employees.   *McCann*, 526 F.3d at 1379 (quoting *National R.R. Passenger Corp. v.*] *Morgan*, 536 U.S. [101,] 116 [(2002)]).  Accordingly,

allegations related to disparities in  overtime, incentive pay, and job
assignments should be excluded from consideration.

(Doc. 27 at 20-21.)

The *McCann* court noted:

Title VII prohibits a hostile work environment in which a series of
separate acts collectively constitute one 'unlawful employment practice.  As
opposed to discrete acts such as termination, failure to promote, denial of
transfer, or refusal to hire, a hostile work environment claim addresses acts
different in kind whose very nature involves repeated conduct, such as
discriminatory intimidation, ridicule, and insult.  Thus, these claims are based
on the cumulative effect of individual acts.

. . .

As the district court properly found, the remainder of McCann's
allegations concern patterns of discrimination practiced against black
employees, which constitute discrete acts that must be challenged as separate
statutory discrimination and retaliation claims.  These cannot be brought under
a hostile work environment claim that centers on "discriminatory intimidation,
ridicule, and insult.

*McCann*, 526 F.3d at 1378, 1379 (internal citations and quotations omitted).  After *McCann*,

in an unpublished decision, the Eleventh Circuit stated, " We have held that hiring decisions,

work assignments, and alleged retaliation claims constitute discrete acts and not acts that are

considered part of a hostile work environment."  *Davis v. Coca-Cola Bottling Co. Consol.*,

516 F.3d 955, 970 (11th Cir. 2008)."  *Freeman v. City of Riverdale*, No. 08-15230, 2009 WL

1510275, *2 (11th Cir. June 1, 2009).

Hostile work environments develop after, and are proven by evidence of, the

cumulative effect of repeated, offensive acts of harassment, i.e. "discriminatory intimidation,

ridicule, and insult." *Miller*, 277 F.3d at 1275.  In that regard, "[h]ostile environment claims are different in kind from discrete acts," *National R.R. Passengers v. Morgan*, 536 U.S. 101, 115 (2002), because discrete acts of employment discrimination, including "termination, failure to promote, denial of transfer or refusal to hire," *id.* at 114, are "specific employment decisions with immediate consequences," *id.* at 115.

Although the court typically must consider all acts that occur during the entire period of the alleged hostile environment, the court need not consider acts about which an employee complains that are not part of the same hostile environment.  However, the court may consider the official act of the supervisor as part of a hostile work environment when the plaintiff demonstrates "a causal link between the tangible employment action and the [discriminatory] harassment."  *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231-32 (11th Cir. 2006)(citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998); *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312 (11th Cir. 2001)). The Seventh Circuit Court of Appeals has "stated that '[t]he concept of cumulation suggests a critical limiting principle.  Acts . . . so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain . . . .'" *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 727 (7th Cir. 2004)(quoting *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002)); *see also Huckabay v. Moore*, 142 F.3d 233, 239-40 (5th Cir. 1998).

18

For purposes of deciding defendant's summary judgment motion, the court assumes that Sype's actions can be reasonably linked together into a single chain.  Nevertheless, the court finds the conduct of which plaintiff complains does not establish a hostile working environment.  Plaintiff testified that Sype, who was not usually her Shift Manager, authorized overtime for white, male employees; that he instructed his crews to skip the Brockway coils and to leave them for plaintiff's crew to wrap; that he referred to plaintiff as an old bitch and an old hag outside her presence; that he failed to assign other employees to help plaintiff's crew; and that he criticized her for being slow on a handful of occasions.  The record contains little evidence of any direct contact between plaintiff and the alleged harasser, Sype. Indeed, although plaintiff has produced evidence that Sype repeatedly referred to her as a bitch or a hag, this name calling did not occur in her presence and words used were unknown to her until after she complained.

Moreover, the majority of plaintiff's alleged incidents of harassing conduct cannot be considered in determining whether she experienced a hostile work environment.  The discrete job decisions alleged by plaintiff, related to her job assignments, do not constitute harassment. "[T]he 'hostile' aspect of remaining in an undesirable job assignment is not akin to a pervasive environment claim; it is a discrete employment decision, however adverse it may be." *DeNovellis v. Shalala*, 124 F.3d 298, 311 (1st Cir. 1997).  Indeed, the Eleventh Circuit has held:

> Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to

19

> allocate its assets in response to shifting and competing market priorities. . .
> . For [this] reason[ ], applying the adverse action requirement carefully is
> especially important when the plaintiff's claim is predicated on his
> disagreement with his employer's reassignment of job tasks. . . . We do not
> suggest that a change in work assignments can never by itself give rise to a
> Title VII claim; in unusual instances the change may be so substantial and
> material that it does indeed alter the "terms, conditions, or privileges" of
> employment.

*Davis v. Town of Lake Park*, 245 F.3d 1232, 1244-45 (11th Cir. 2001). Therefore, to the

extent plaintiff attempts to rely on discrete job decisions to establish that her work

environment was hostile or abusive, the court has not considered these allegations in

determining whether the work environment was hostile or abusive because of plaintiff's race

and/or gender.

"For an atmosphere of sexual [or racial] harassment or hostility to be actionable, . .

. the offending behavior must be sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment." *Suders,* 542 U.S. at

146-47 (internal citations and quotations omitted).  In *Gupta*, the Eleventh Circuit held:

> The fourth element – that the conduct complained of was "sufficiently severe
> or pervasive to alter the conditions of employment and create an abusive work
> environment" – is the element that tests the mettle of most sexual harassment
> claims.  Requiring the plaintiff to prove that the harassment is severe or
> pervasive ensures that Title VII does not become a mere "general civility
> code."

*Gupta*, 212 F.3d at 583 (citing *Faragher*, 524 U.S. at 788).

"Title VII prohibits only the type of severe or pervasive sexual [or racial] harassment

that 'alter[s] the conditions of the victim's employment.'" *Johnson v. Booker T. Washington*

*Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000)(quoting *Oncale*, 523 U.S. at

80-81).  "Every job has its frustrations, challenges and disappointments; these inhere in the

nature of work."  *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985).

Therefore, the Court requires that, to be actionable, the harassing conduct must "be ***extreme***

to amount to a change in the terms and conditions of employment."  *Faragher*, 524 U.S. at

788 (citing *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-78 (2d Cir. 1989);

*Moylan v. Maries County*, 792 F.2d 746, 749-50 (8th Cir, 1986))(emphasis added).

The  court  finds  the  record  does  not  contain  sufficient  evidence  upon  which  a

reasonable jury could find that Sype's conduct was so extreme, so severe or pervasive, that

it altered the terms and conditions of plaintiff's employment and made her work environment

hostile because of her race and her gender.

Therefore, defendant's Motion for Summary Judgment is due to be granted and

plaintiff's claims will be dismissed.[5]

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts

in dispute and defendant is entitled to judgment as a matter of law.  An Order granting

---

[5]Because the court finds that plaintiff's claims are due to be dismissed, it pretermits discussion of whether her claims were barred by the statute of limitations for Title VII and section 1981 claims, and whether defendant was entitled to the *Faragher/Ellerth* affirmative defense.

defendant's Motion for Summary Judgment, (doc. 25), will be entered contemporaneously

with this Memorandum Opinion.

      **DONE**, this the 21st day of September, 2009.


SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE